IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| APOTEX CORP., | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 04 C 7312 |
| MERCK & CO., INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Apotex Corp. has sued Merck & Co., alleging that Merck committed fraud on this Court in obtaining judgment in its favor in an earlier case in which Apotex had sued Merck for patent infringement. Before the Court are motions by Apotex seeking to compel Merck to respond to certain interrogatories and document requests that Merck has resisted on various grounds. For the reasons stated below, the Court grants the motions in part and denies them in part.

### Background

In an earlier case that was assigned to this Court's docket, Apotex sued Merck for infringing U.S. Patents No. 5,573,780 and 5,690,962. *Apotex Corp. v. Merck & Co.*, No. 96 C 7375 (N.D. Ill.). Both patents cover a process for making a pharmaceutical compound used to treat high blood pressure. As the Court described the process in that case, it involves mixing the active ingredient, enalapril maleate, with an alkaline sodium compound and at least one other inactive ingredient, adding water to the mix, drying it, and processing it into tablets. The claimed novelty of the invention was that it produced a stable compound without requiring the steps of

suspending the enalapril maleate in water, adding the alkaline sodium compound, and mixing until the reaction is complete and a clear solution is formed. *See Apotex Corp. v. Merck & Co.,* No. 96 C 7375, 2000 WL 97582, *1 (N.D. Ill. Jan. 25, 2000). In the suit, Apotex alleged that Merck had infringed the patents in its process for making Vasotec, Merck's trade name for an enalapril maleate tablet.

The Court ruled that Merck had infringed the patents but that the patents were invalid under 35 U.S.C. § 102(g). Section 102(g) provides that a person is not entitled to a patent if "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." Merck contended that it had invented the process for Vasotec in this country prior to March 30, 1994, the earliest date on which the patent applicant, Dr. Bernard Sherman, claimed to have conceived the process, and that it had neither abandoned, suppressed, nor concealed the process. Apotex conceded that Merck had made the invention in the United States, had reduced it to practice here, and had not abandoned the invention. It contended, however, that Merck had suppressed and/or concealed the invention as of the time that Dr. Sherman had conceived of the process.

The Court concluded that Merck had shown by clear and convincing evidence that it had not suppressed or concealed the invention. *Id.,* *7-8. In this regard, the Court relied on the fact that Merck had prepared and widely distributed a monograph listing the ingredients used to make Vasotec; had described its product in the *Dictionnaire Vidal,* a French-language pharmaceutical dictionary; and had publicly disclosed the process for making Vasotec at the trial of a patent infringement suit brought by Merck in Canada, during which Brian McLeod, Merck's vice president of marketing, displayed and narrated a video recording demonstrating the process. *Id.,*

*7. Merck's motion for summary judgment included as supporting material an affidavit by Dr. Gerald Brenner, the company's retired former director of research, who stated that McLeod's Canadian testimony regarding the manufacturing process "provides an accurate summary explanation of the steps of mixing enalapril maleate, a carrier, a stabilizer, and a disintegrant; adding water to a mixture of the milled ingredients to create a damp mass in a wet granulation step; drying the damp mass; and ultimately tableting the dried ingredients after they are blended with the lubricant magnesium stearate," and that the product monograph "contains an accurate identification of the ingredients used in that process." Brenner Affid. (Case No. 96 C 7375), ¶ 5. The Court rejected Apotex's argument that Merck's disclosures were insufficient to show a person of ordinary skill in the art how to duplicate the process. *Id.* *8.

The Federal Circuit affirmed this Court's judgment. In its ruling, the Federal Circuit relied on the same disclosures that had led this Court to rule in Merck's favor and, like this Court, rejected Apotex's argument that those disclosures did not adequately describe the process for manufacturing Vasotec. *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1040 (Fed. Cir. 2001).

In the May 2004 trial of a later lawsuit, held in federal court in New Jersey, Dr. Brenner gave the following testimony:

> Q: ... Dr. Brenner, following the introduction of Vasotec in the market place, did Merck decided to maintain the role of sodium bicarbonate in its process as a trade secret?
>
> A: Yes, it did.
>
> Q: How long did Merck maintain its Vasotec process in [sic] the role of sodium bicarbonate in that process as a trade secret?

3

A: I would say at least to the late eighties or early nineties.

...

Q: Was there any consensus at Merck at that time period regarding whether people in the field could discern Merck's process for the role of sodium bicarbonate in that process from this reference?

A: The consensus within Merck was that knowing the ingredients themselves, the typical work [sic] in the field could not discern the process by which Merck made Enalapril tablets.

...

Q: Can you explain why Merck felt that way? Why didn't Merck feel that the various threats [sic] of information you've identified now, Bolvadeer, the tablets, the package insert, in the Dictionnaire Vidal would not tell one in the field the role of sodium bicarbonate in the Vasotec process, and how to use that to stabilize Vasotec?

A: Well, basically, you know, at that point in time when Merck decided to keep this as a trade secret, all of those individuals, mostly myself and two other individuals in the department were aware of perhaps around five years of work that had been done on Enalapril, the magnitude of the work, and the difficulty of stabilizing the tablet. And with that realization in hand, the three of us were essentially, were the primary movers in making that decision, felt that with the experience and the knowledge of the difficulty in developing the process, the ingredients, themselves, wouldn't be sufficient to develop the process without the long experimentation that we had to do over a long period of time.

*Warner-Lambert Co. v. Teva Pharmaceuticals USA*, No. 99-922, Trial Tr. May 4, 2004 at 27-28, 29, 35-36 (D.N.J.). Dr. Brenner also testified as follows:

Q: Now, Dr. Brenner, to your knowledge as of 1994, had Merck ever disclosed any element of its process or the role of sodium bicarbonate in that process publicly?

A: Not that I'm aware of.

Q: And as of 1994, when you left the company, were you aware of anyone in the industry that had figured out either the process or sodium bicarbonate's role in that process?

4

A:    Not that I'm aware of.

*Id.,* Trial Tr. May 6, 2004 at 725.

Based on this and other like testimony, Apotex filed suit, contending that Merck had concealed from the Court that it "had kept the critical role of the sodium bicarbonate a trade secret." Am. Cplt. ¶ 17; *see also id.* ¶¶ 13, 21, 26, 29, 31 (other references to the concealment of the "critical role of sodium bicarbonate"). It appears Apotex's specific contention is that although Merck's public disclosures had identified sodium bicarbonate as an ingredient, they had not described exactly how that substance was used in the process for making Vasotec. *See* Merck Combined Reply at 8-19. Apotex's complaint includes three claims, all based on the conduct by Merck referenced above: a claim for relief from the judgment in the earlier lawsuit; a common law fraud claim; and a claim of tortious interference with prospective advantage.

## Discussion

Apotex has moved to compel Merck to respond, or provide more complete responses, to certain interrogatories and document requests. Merck has objected to some of the interrogatories and document requests based on their claimed irrelevance and to several of the document requests because it says they call for information protected by the attorney-client or work product privileges. With regard to the privilege claim, Apotex contends that any privilege should be deemed waived under the so-called "crime-fraud" exception.

### 1.   Relevance

Merck contends that the requests are irrelevant because Apotex cannot sustain the claims it has made in this case. Merck has neither moved to dismiss nor sought summary judgment; rather it has answered the complaint. Nor did it seek a stay of discovery or protective order

5

barring or limiting discovery. Under the circumstances, its contention that Apotex will ultimately lose the case is not a proper basis to refuse to respond to Apotex's discovery requests.

For the same reason, the Court rejects Merck's argument that Apotex's discovery requests should not be enforced because they amount to a rehash of the earlier lawsuit. There is, in fact significant overlap between Apotex's discovery requests and matters that were litigated in the prior case. But that is inevitable given Apotex's assertion of a claim of fraud on the court. Without more, this is not a proper basis for Merck to refuse to answer Apotex's discovery requests.

Merck is therefore directed to answer within 10 days of this order each of the requests to which it has interposed no privilege objection – specifically, all the disputed interrogatories, and each document request other than requests 1-10 and 16. *See* Merck Combined Opp. at 14 (identifying those requests as the ones to which a privilege objection is made).

### 2. Privilege

Merck has objected to certain of Apotex's document requests on the grounds they seek information protected by the attorney-client or work product privileges. It is unclear whether Merck has provided a so-called "privilege log" as required by Fed. R. Civ. P. 26(b)(5). If not, Merck must do so within 10 days of this order and must also produce all non-privileged documents responsive to each document request. On the assumption that some privileged documents have been or will be identified, the Court will proceed to assess the privilege claim.

The requests to which a privilege objection is interposed seek documents relating to Brenner's affidavit and testimony and McLeod's testimony, including drafts and comments by counsel (requests 1, 2, 5, 7 and 8); drafts of Merck's summary judgment and Federal Circuit

briefs and attorney comments concerning those items (requests 3 & 4); documents related to Merck's intention to keep the process for Vasotec a trade secret (request 9); and documents related to Brenner's role in the prior Apotex - Merck lawsuit (request 10).[1] Apotex appears to concede that it is seeking privileged information via each of these requests but argues that the privilege should be deemed waived on the ground that Merck used the attorney-client relationship to perpetrate a fraud.

The purpose of the attorney-client privilege is to encourage full disclosure by clients to their attorneys so that clients can obtain fully informed legal advice. *See, e.g., Fisher v. United States*, 425 U.S. 391, 403 (1976). By fostering full and frank communication between clients and attorneys, the privilege "promotes broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The work product doctrine "functions not merely and (perhaps) not mainly to assist the client in obtaining complete legal advice but in addition to establish a protected area in which the lawyer can prepare his case free from adversarial scrutiny." *In Re Special September 1978 Grand Jury*, 640 F.2d 49, 62 (7th Cir. 1980). If an attorney's work product were "open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Hickman v. Taylor*, 329

---

[1] The Court notes in passing that it is unclear exactly how request 9 seeks information protected by the attorney-client or work product privileges; perhaps Merck's privilege log will make this clear.

7

U.S. 495, 511 (1947).

However, "[t]he privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Clark v. United States*, 289 U.S. 1, 15 (1933). But "'[i]t is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.... To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'" *Id.* (quoting *O'Rourke v. Darbishire*, A.C. 581, 604 (1920)).

The Seventh Circuit has held that the requirement of a *prima facie* showing of a crime or fraud does not require evidence sufficient to support a verdict, but rather, enough evidence to "require explanation" by the party seeking to withhold privileged material. *In re Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988). The *Feldberg* standard arguably has been superseded by the Supreme Court's decision in *United States v. Zolin*, 491 U.S. 554 (1989), in which the Court held that to obtain *in camera* review of privileged materials claimed to be subject to the crime-fraud exception, there must first be a showing "of a factual basis adequate to support a good faith belief by a reasonable person" that the exception applies. *Id.* at 572. If a showing of that nature is needed as a threshold for a court simply to review privileged material to determine if the exception applies, then it is reasonable to infer that a greater showing is needed to apply the exception and order disclosure.[2] But the Court need not address this issue, for we conclude that Apotex has failed to make the requisite showing even under the more lenient standard of *Feldberg*.

---

[2] Apotex has not sought *in camera* review of any materials subject to the privilege claim.

8

Apotex's argument that Merck committed a fraud in its defense of the earlier case is premised on Merck's failure to advise this Court and the Federal Circuit that it had maintained secrecy over part of its process for making Vasotec and that the claimed public disclosures purportedly did not describe that process in full, or even well enough for a person of ordinary skill in the art to figure out the details. Merck disputes the latter contention. It argues that even considering what was allegedly withheld, the disclosures of its process were sufficient to invalidate Apotex's patents under § 102(g). But the Court need not address that point. As discussed below, Apotex's claim, even if taken as true, does not satisfy the *prima facie* standard of *Feldberg*.

Apotex contends Merck made false statements in the earlier litigation. The only false statements it identifies, however, are the statements of Merck's attorneys in their briefs filed with this Court and on appeal, to the effect that Merck had not suppressed the Vasotec process within the meaning of § 102(g). One of the issues presented by Apotex's motion to compel is whether these statements by Merck's lawyers support the invocation of the crime-fraud exception. Apotex's argument is that because the role of sodium bicarbonate in the Vasotec process was not revealed in the disclosures that Merck relied upon in its § 102(g) argument, the statements in Merck's briefs that the process had not been suppressed or concealed were false.

Read fairly in context, however, the lawyers' statements in Merck's briefs were not an attempt to characterize the truth as an omniscient observer might see it. Rather, they were comments on the sufficiency of the evidence that was submitted in the case. As such, the statements were true, and were found to be true by this Court and the Federal Circuit; both courts found the evidence established that the Vasotec process had not been concealed. It was not a

"fraud" for Merck to argue the inferences from the evidence that had been presented in the case – even if it now turns out that the evidence that was presented might not have represented the full story. Absent a showing that Merck had withheld or concealed evidence requested in discovery or presented false testimony or evidence, the contention in its briefs that there was no concealment of the Vasotec process was an appropriate argument regarding the evidence that had been offered. It is not indicative of a fraud such as is necessary to invoke the crime-fraud exception under *Feldberg*.

Apotex has offered no evidence that Merck did anything in the earlier case to obstruct the process of the administration of justice. Apotex presents no evidence that Merck offered any false testimony; it makes no showing that Merck withheld any documents or information that were requested in discovery; it does not contend that McLeod's testimony from the Canadian case was untrue; and it does not claim that Merck did anything to prevent Apotex from uncovering any information that it might want to learn – including the fact that Merck had not publicly revealed the particular way sodium bicarbonate was used in the Vasotec process. It does appear that Apotex failed to learn this fact during discovery in the earlier case. But there is no basis in the record now before the Court to attribute this to anything Merck did or failed to do. Rather, it appears from the record that Apotex failed to ask for information in discovery that would have revealed the particular way sodium bicarbonate was used in the Vasotec process.

Apotex seems to suggest that by raising the § 102(g) issue, Merck effectively assumed an obligation to make full disclosure of all the evidence bearing on that issue, helpful or harmful, even without appropriate discovery requests by Apotex. But for better or worse, that is not the way civil litigation works. Our system of justice largely leaves it to the adversarial process to

ferret out the truth. That process does not always work perfectly even if all parties comply with their obligations; sometimes one side or another does not ask the right questions and as a result fails to uncover helpful evidence. But when that happens in a civil case, the other side has no independent obligation to produce what it has not been asked to produce, unless a statute or rule requires it to do so.

Similarly, nondisclosure does not amount to fraud absent a duty to speak. *See, e.g., Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 435 (7th Cir. 1996) (Illinois law); *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) ("mere failure to disclose, absent something more," does not constitute mail fraud under federal statute). In this case Apotex has failed to show that Merck had such a duty. A prosecutor in a criminal case has a duty to disclose evidence that undercuts his case. *E.g., Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). But this obligation, which stems from the Constitution's requirement of due process of law, is not imposed upon any other litigant, be it a civil litigant or a defendant in a criminal case. Parties to civil litigation are, of course, required to produce information, helpful or harmful, that is requested in discovery or whose disclosure is required by statute or rule. However, Apotex has identified no such request or requirement that would have called for Merck to produce the evidence in question. Absent such a request or requirement, a civil litigant has no independent obligation to volunteer information to its opponent.

The Rules of Professional Conduct impose upon attorneys a duty of candor vis-a-vis the court. Those Rules provide that a lawyer may not, among other things, "make a statement of material fact or law to a tribunal which the lawyer knows or reasonably should know is false" or

11

"offer evidence that the lawyer knows to be false" or whose falsity the lawyer comes to know. N.D. Ill. LR 83.53.3(a)(1) & (4). But the Rules take into account the fact that the lawyer "is usually not required to have personal knowledge of matters asserted" in pleadings, "for litigation documents ordinarily present assertions by the client, or by someone on the client's behalf, and not assertions by the lawyer." *Id.*, Committee Comments. Thus, "an assertion *purporting to be on the lawyer's own knowledge,* as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." *Id.* (emphasis added). Based on the record now before the Court, the statements by Merck's attorneys in their briefs in the earlier case did not run afoul of the Rules of Professional Conduct, because they did not purport to be based on the lawyers' own knowledge. The Rules do not bar a lawyer in a civil case from arguing the evidence in the case, even if that evidence does not represent the truth as an omniscient observer might see it.

Contrary to Apotex's suggestion, the obligations of Merck's attorneys under Federal Rule of Civil Procedure 11 do not suggest their knowledge of the purported falsity of the arguments in their briefs. Rule 11(b)(1) provides that by presenting the court with a pleading, written motion, or other paper, an attorney certifies, among other things, that "to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances .. the allegations and other factual contentions have evidentiary support ...." Fed. R. Civ. P. 11(b)(1). The record as it has been presented to the Court does not reflect that Merck's attorneys fell short of this Rule's requirements. Assessment of compliance with Rule 11(b)(1) requires examination of the "evidentiary support" for the attorney's assertion, not its truth in the abstract. As the Court

has found, Merck's attorneys were making arguments based on the evidence as it had been presented, and as such their arguments comported with Rule 11. Apotex cannot legitimately bootstrap the Rule 11 obligations of Merck's attorneys into a *prima facie* showing that they must have known the falsity of their arguments to the Court.

Apotex contends that Brenner's affidavit submitted in the earlier case amounts to a half-truth. A half-truth – in other words a disclosure that is misleading because it omits important information – can constitute fraud. *See, e.g., Emery v. American Gen'l Finance, Inc.*, 71 F.3d 1343, 1346-47 (7th Cir. 1995). But Brenner's affidavit was not a half-truth. There is no viable claim that Brenner's statement that the McLeod testimony "provides an accurate summary explanation of the steps of" mixing the ingredients, adding water to create a damp mass, drying the mass, and tableting the ingredients after blending them with a lubricant, Brenner Affid. ¶ 5, was the least bit untrue. Nor is there a viable claim that Brenner's own six-line summary description of the process was untrue. *Id.* ¶ 6. Rather, Apotex's contention is that these explanations were incomplete. But Brenner did not say or imply that the explanations were a detailed, blow-by-blow description of how to make Vasotec; a summary is just that, a summary. Apotex had the opportunity to take Brenner's deposition and, during that deposition, was free to explore every aspect of the Vasotec process and exactly what Merck, Brenner, and McLeod had and had not disclosed.[3] Apotex's apparent failure to ask Brenner or Merck the right questions does not suggest fraud on the part of Merck.

Based on what Apotex now knows, the conclusion that Merck's invention was not

---

[3] If Apotex had already taken Brenner's deposition before the affidavit was submitted, it could have asked the Court to reopen the deposition after receiving the affidavit.

13

concealed within the meaning of § 102(g) may have been in error (though, as noted earlier, we make no determination of that point). But the fact that the decision in the earlier case might be wrong, based on information that Apotex evidently did not request in that case, does not entitle Apotex to pierce Merck's attorney-client privilege. Apotex has failed to make a *prima facie* showing of the commission of a crime or fraud by Merck or its attorneys. For this reason, the Court denies its request to order Merck to produce documents that are protected by the attorney-client or work product privileges.

## Conclusion

Fore the reasons stated above, Apotex's motion to compel Merck to answer Apotex's first set of interrogatories is granted [docket # 34], and Apotex's motion to compel Merck to produce in response to Apotex's first set of production requests is granted in part and denied in part [docket # 31]. The case is set for a status hearing on July 5, 2005 at 9:30 a.m.

                                                MATTHEW F. KENNELLY
                                                United States District Judge

Date:   June 29, 2005